## UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
#### TAMPA DIVISION

**ANGELA LLEWELLYN,**

      **Plaintiff,**

**v.**                                              **Case No.  8:07-cv-1736-T-30TGW**

**TAMPA ELECTRIC COMPANY,**

      **Defendant.**

_____/

### ORDER

THIS CAUSE comes before the Court upon Defendant's Motion for Summary Judgment and Supporting Memorandum of Law (Dkt. 19).  Despite being granted an extension, Plaintiff has failed to timely respond to the instant Motion.[1]  The Court, having thus considered the Motion without the benefit of a response, and being otherwise fully advised in the premises, determines it should be granted.

### Background

On or about October 19, 1990, Angela Llewellyn ("Plaintiff") was hired by Tampa Electric Company ("Defendant").  From July 1, 1998, to February 8, 2006, Plaintiff was supervised by Deirdre Brown, Defendant's Vice President of Customer Service and Regulatory Affairs.  Prior to the termination of her employment, Plaintiff held the position of Administrator in Defendant's Regulatory Affairs Department.

---

[1]On August 27, 2007, the Court granted Richard L. Bradford's Motion to Withdraw as Plaintiff's counsel.  Plaintiff has since proceeded *pro se* in this action.

On or about January 1, 2006, Brown assumed management responsibility of the customer service department and reorganized the reporting structure.  As a result of the reorganization, Brown informed Plaintiff on February 8, 2006, that she would be reporting to Denise Jordan, Director of Rates and Planning.  Plaintiff objected to the proposed change, expressing that she did not like Jordan's management style and that she did not believe she would "fit well underneath her."  (Plaintiff's Dep. at 16).  Plaintiff believed that Jordan was "very hostile and difficult to be around."  (Plaintiff's Dep. at 17).  Brown informed Plaintiff that the change would remain in effect, and that she would be meeting with Jordan later that day.

Prior to her meeting with Jordan, Plaintiff discussed the change in supervision with her staff.  Plaintiff claims Jordan eavesdropped on the conversation from an adjacent office. When she later met with Jordan, Plaintiff claims Jordan reprimanded her for meeting with her staff and falsely accused her of complaining about the change in supervision.[2]  Plaintiff described the conversation as a "verbal beating, just abuse," and stated she had to leave the meeting because she could not take it any longer.  (Plaintiff's Dep. at 15).  Jordan claims that during the meeting, Plaintiff informed her that she was dealing with a host of personal problems and expressed an intention to resign from her position.  Plaintiff admits to telling Jordan that she was going to resign because she could not work in such an environment.

---

[2]Plaintiff claims it was her staff who was complaining about the change of supervision during the meeting.  She also claims that prior to the meeting, she was warned by a co-worker that Jordan was ready to "explode" at her.  (Plaintiff's Dep. at 17).

Following the meeting, which lasted approximately thirty minutes, Plaintiff left work for the remainder of the day but did not submit a written resignation.

Plaintiff did not report to work the following day, February 9, 2006.  On that day she visited her psychiatrist, Dr. Joseph Lupo.  Dr. Lupo had been treating Plaintiff since March 28, 2005, for major depression and anxiety disorder.[3]  During the visit, Plaintiff reported she felt "beat," that she had been demoted at work, and that she had to report to a new supervisor who was an "awful, mean person" who was critical of her performance.[4]  (Lupo Dep. at 23). Plaintiff also reported that (i) her significant other of thirteen years was living with another woman, (ii) she was feeling guilt over potentially having to put her granddaughter up for adoption, (iii) she had contemplated suicide, and (iv) she felt she had nothing to live for. (Lupo Dep. at 23).  Dr. Lupo adjusted Plaintiff's medication and provided her with a note recommending that she be excused from work for two weeks.

On the following day, Friday, February 10, 2006, Plaintiff took another vacation day. Jordan attempted to contact Plaintiff via telephone and email to clarify whether she desired to continue her employment with Defendant.  Plaintiff responded, indicating that she intended to remain employed but that she would explore other options within the company.

---

[3]Plaintiff claims that at some point she was diagnosed with post-traumatic stress disorder as a result of the thirty minute meeting with Jordan.  However, she has not provided medical evidence of this diagnosis.

[4]Though somewhat unclear from the record, it appears Plaintiff viewed the need to report to Jordan as a demotion.  Plaintiff has not, however, provided evidence that her salary or responsibilities changed as a result of the restructuring.

On Monday, February 13, 2006, Plaintiff was excused from the office for jury duty. While out for jury duty, Plaintiff contacted Director of Employee Relations William Gregory ("Gregory") to initiate an internal complaint against Jordan. Plaintiff alleged Jordan created a hostile work environment and requested a transfer because she could no longer work underneath her. Gregory informed Plaintiff that she was free to apply for any vacant position for which she was qualified. There is no record evidence that Plaintiff ever applied for another position.

According to Gregory, at no time did Plaintiff indicate that she suffered from depression or post-traumatic stress disorder or complain that the hostile treatment she received from Jordan was based on these or other alleged disabilities. Upon completing an internal investigation of Plaintiff's allegations, Gregory concluded that Jordan's behavior had not created a hostile work environment. Gregory acknowledged, however, that Jordan's behavior did "yield some areas for concern, but only to a level that would normally trigger a developmental action plan, or specific coaching," and that some behaviors exhibited by Jordan fueled a perception that she was rigid and uncompromising. (Exhibit A to Affidavit of William Gregory, Dkt. 24-2).

Plaintiff was absent from work from February 14, 2006, through February 28, 2006. While she returned to work on March 1, 2006, a day Jordan was out of the office, she was out sick again from March 2, 2006, through March 12, 2006. On or about March 13, 2006, Plaintiff was placed on short term disability pursuant to the terms of Defendant's short term

disability plan. Case management services for the plan were administered by Liberty Life Assurance Company of Boston ("Liberty Mutual").

On May 23, 2006, Liberty Mutual notified Defendant that Plaintiff's short term disability benefits were not approved because the documentation she provided did not support her claim of disability. Defendant granted Plaintiff leave while she appealed this decision and provided Liberty Mutual with additional information. On or about June 30, 2006, Liberty Mutual informed Plaintiff and Defendant that Plaintiff's request for reconsideration was denied. Liberty Mutual concluded Plaintiff failed to provide sufficient medical evidence to support her alleged impairment and thus did not meet the plan's definition of "disability." As a result, Defendant instructed Plaintiff to return to work on July 10, 2006.

While Plaintiff was out on short term disability, Defendant's Purchasing and Contracts Manager, Amy Fowler, discovered Plaintiff had violated company policy by making personal charges and incurring late fees on a company credit card. In addition, Plaintiff failed to make payment on several charges that had previously been reimbursed by Defendant. Plaintiff's card was cancelled as a result. During the same time period, Jordan discovered that Plaintiff was making personal calls from a company issued cell phone. The minutes used exceeded those allotted by Defendants cellular service provider. As a result, Jordan had Plaintiff's plan suspended.

On July 10, 2006, Plaintiff returned to work as instructed. Jordan informed that her responsibilities would be temporarily reduced following her extended absence. Jordan

claims this decision was based in part on concerns expressed by Plaintiff's subordinates that she was not adequately performing her managerial and supervisory duties.  Furthermore, Jordan claims she was not aware of Plaintiff's alleged disability.  Jordan believed Plaintiff had suffered from a temporary condition while out on leave.  According to Jordan, she was not privy to any information provided by Liberty Mutual to Defendant regarding Plaintiff's condition.

Later that day, Plaintiff slipped a letter from Dr. Lupo under Jordan's door.   In the letter, Dr. Lupo advised that he did not believe Plaintiff was "medically stable to return to work without risk," but that he had encouraged her to "go ahead and try to return and if she can cope well enough that would be good."  (Lupo Dep. at 40 and Exhibit 2).  While the letter was forwarded to Liberty Mutual, Liberty Mutual did not alter its prior decision to deny short term disability benefits.

On or about July 24, 2006, Plaintiff was assigned to work for two weeks on a Federal Energy Regulatory ("FERC") audit.  While she was not supervised directly by Jordan during the audit, Jordan was aware of her progress and performance.  According to Jordan, Plaintiff did not complain to her or any other supervisor that she was unable to work the required hours or perform the necessary tasks to complete the audit.

From July 11, 2006, through August 16, 2006, Plaintiff was late for work on five occasions and missed two and a half days of work due to illness.  On August 17, 2006, Plaintiff left a message with Jordan informing her that she was checking herself into St. Joseph's Hospital at the direction of Dr. Gary Wood.  Plaintiff had been seeing Dr. Wood,

a psychologist, voluntarily through Defendant's Employee Assistance Program. Plaintiff did not show up to work on Friday, August 18, 2006, or Monday, August 21, 2006. Plaintiff failed to call Jordan on either of these days to report she was taking a sick day, in violation of company policy and prior directives.

On or about August 21, 2006, Gregory was informed Plaintiff had not checked herself into the hospital. Gregory claims he then called Dr. Wood to inquire whether he had instructed Plaintiff to admit herself into the hospital. Dr. Wood stated he had only provided Plaintiff with contact information about the hospital for emergencies and inpatient facilities for medical care.[5] Dr. Wood had further advised Plaintiff to consult with Dr. Lupo before making any medical decisions.

On August 22, 2006, Plaintiff met with Jordan. Plaintiff claimed she did not check into the hospital because Dr. Lupo was out of town and she had been instructed by Dr. Wood to clear all medical decisions with Dr. Lupo. According to Jordan, Plaintiff told her Dr. Lupo believed she should be transferred somewhere else in the company. If a transfer was not possible, Plaintiff requested a separation package. Jordan claims she never received any

---

[5]Defendant has not provided sworn testimony of Dr. Wood. Gregory discusses his conversations with Dr. Wood in his affidavit. See Affidavit of William Gregory (Dkt. 24). Defendant argues the information contained in Dr. Wood's statements is being offered as evidence of Gregory's state of mind. As Plaintiff has not responded to the instant Motion, Plaintiff has not objected to the Court's consideration of these statements allegedly made by Dr. Wood. Furthermore, Defendant has provided copies of Dr. Wood's progress notes from August 15, 2006, which are consistent with these statements. Plaintiff acknowledged the notes in her deposition as being representative of Dr. Wood's suggestion that she check into the hospital. (Plaintiff's Dep. at 84-85 and Ex. 16-17). In his notes, Dr. Wood writes, "I've given her contact information for Bay Life Management and St. Joseph's Hospital for emergency care," but does not reference any suggestion that Plaintiff admit herself into the hospital.

documentation from Dr. Lupo to this effect, nor was she ever told Plaintiff had been diagnosed with depression, anxiety, or post-traumatic stress disorder.

Based on Plaintiff's misrepresentation and alleged insubordination, Jordan recommended to Brown and Human Resources Generalist Betty Betz that she be terminated. After Brown and Betz concurred, the matter went before an Employee Status Review Committee ("ESRC") for consideration. The ESRC concluded that Plaintiff had violated Defendant's Standards of Integrity by falsely reporting she was checking into the hospital under the direction of Dr. Wood. The ESRC further concluded Plaintiff was insubordinate in failing to report to Jordan that she was taking sick days on August 18, 2006, and August 21, 2006. Jordan informed Plaintiff over the phone on August 23, 2006, that her employment was terminated. The next day, Plaintiff visited Dr. Wood and obtained a note purporting to excuse her from work for medical reasons from August 17, 2006, through August 28, 2006. Jordan claims she was never provided with this letter.

Following her termination, Plaintiff filed a charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). After receiving a Dismissal and Notice of Rights from the EEOC, Plaintiff filed the instant action. Plaintiff alleges Defendant discriminated and retaliated against her in violation of the Americans with Disabilities Act ("ADA") and the Florida Civil Rights Act ("FCRA"). Defendant has moved for summary judgment as to all of Plaintiff's claims.

## Summary Judgment Standard

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(emphasis in original).  The substantive law applicable to the claimed causes of action will identify which facts are material.  Id.  Throughout this analysis, the judge must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in his or her favor.  Id. at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. Chelates, 477 U.S. at 324.  The evidence must be significantly probative to support the claims.  Anderson,  477 U.S. at 248-49.

This Court may not decide a genuine factual dispute at the summary judgment stage. Fernandez v. Bankers Nat'l Life Ins. Co., 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." Warrior Tombigbee

Transp. Co., Inc. v. M/V Nan Fung, 695 F.2d 1294, 1296 (11th Cir.1983).  A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson, 477 U.S. at 248; Hoffman v. Allied Corp., 912 F.2d 1379 (11th Cir. 1990).   However, there must exist a conflict in substantial evidence to pose a jury question.  Verbraeken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir. 1989).

## Discussion

In Count I of her Complaint, Plaintiff alleges Defendant discriminated and harassed Plaintiff because of her disability.  Pursuant to the ADA, employers are prohibited from discriminating against a qualified individual because of a disability.  42 U.S.C. § 12112(a).[6] To establish a prima facie case under the ADA, a plaintiff has the burden of showing that he or she "(1) had a disability; (2) was otherwise qualified to perform the job; and (3) was discriminated against based on his [or her] disability."  Collado v. United Parcel Service, Co., 419 F.3d 1143, 1149 (11th Cir. 2005).[7]  If  a plaintiff establishes a prima facie case of

---

[6]The Court acknowledges that Congress passed the ADA Amendments Act of 2008 (the "2008 ADA Act") on September 25, 2008.  The effective date of the new legislation is January 1, 2009.  The amended provisions are referenced in this Order when relevant.

[7]In Brandon v. Lockheed Martin Aeronautical Systems, 393 F. Supp. 2d 1341, 1345 (N.D.Ga. 2005), Judge Vining discussed his belief that the Eleventh Circuit has incorrectly formulated the third prong of this analysis.  Judge Vining notes the third prong as stated in Collado is incorrect "because if a plaintiff has proved that he was discriminated against because of his disability, he has actually proved his entire case (and he is entitled to have judgment entered in his favor), not simply made a prima facie showing."  Id.  The third prong, he argues, should require a showing of an adverse employment action, as is required in other discrimination suits.  Id.  Arguing further that the Eleventh Circuit has never applied the prong as stated, but rather required a plaintiff to simply "present facts from which an inference of discrimination can be made," Judge Vining went on to require that a plaintiff need only show that an adverse employment action was taken to satisfy the third prong.  Id.

discrimination, the burden shifts to the defendant employer to "articulate a legitimate, non-discriminatory reason for the challenged action." Wascura v. City of South Miami, 257 F.3d 1238, 1242 (11th Cir. 2001).   If the defendant satisfies its burden, the presumption of discrimination is eliminated and the  plaintiff must "proffer sufficient evidence to create a genuine issue of material fact as to whether each of the defendant's proffered reasons is pretextual." Id. at 1243.

The 2008 ADA Act defines "disability" with respect to an individual as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(a)(1).  Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."   42 U.S.C. §  12102(a)(2).   "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to [a prohibited action] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(a)(3).

While Plaintiff has not responded to the instant Motion, the Court has reviewed her deposition testimony and answers to interrogatories filed by Defendant in connection with the instant Motion.  During her deposition, Plaintiff implied that she was substantially limited in the major life activities of working, sleeping, and concentrating.  The Court will examine

each of these activities in considering whether Plaintiff has shown she was disabled within the meaning of the ADA.

An individual is substantially limited in the activity of working if he or she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i).[8] Moreover, the "inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." Id.

Dr. Lupo's July 10, 2006 letter indicated he did not believe Plaintiff was "medically stable to return to work without risk," but also indicated his encouragement for her "go ahead and try to return and if she can cope well enough that would be good." On August 22, 2006, the day before Plaintiff was terminated, Dr. Lupo wrote a letter to Dr. Wood noting that Plaintiff was extremely agitated in the work place due to conflicts with her boss, stating further that "I am not certain how much is perceived and how much is close to real." (Exhibit 2 to Lupo Dep., Bates Stamp # 500786). He advised that, if possible, she be transferred to another department. In a medical statement dated February 12, 2007, over five months following Plaintiff's termination, Dr. Lupo stated that Plaintiff's "psychiatric

---

[8]One of the stated purposes of the 2008 ADA Act is to "express Congress' expectation that the Equal Employment Opportunity Commission will revise that portion of its current regulations that defines 'substantially limits' as 'significantly restricted' to be consistent with [the] Act, including the amendments made by [the] Act." Plaintiff has failed to produce any evidence that she was limited or restricted to perform a class of jobs or a broad range of jobs and thus has failed to establish impairment under either standard.

disorder between February, 2006 and August, 2006 (when I last saw her) was so severe that she could not possibly work."   (Exhibit 2 to Lupo Dep., Bates Stamp # 500771).

When asked about the February 12, 2007 medical statement at his deposition, Dr. Lupo stated that Plaintiff's ability to work was not impaired throughout the time he treated her.  Rather, her ability to work was impaired only at the times he wrote excuses.   (Lupo Dep. at 49).  According to Dr. Lupo, he "encouraged her to go to work those last times," and that he felt she should attempt to go to work "to see how she coped."  At no time did Dr. Lupo opine that Plaintiff was substantially limited or restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes.   Rather, his suggestion that Plaintiff be transferred was based on her conflict with Jordan, not her ability to perform a class or range of jobs.

Plaintiff claims she repeatedly requested the "reasonable accommodation" of a transfer due to the stress, anxiety, and hostile environment she faced working under Jordan. Plaintiff request for a transfer was not based on an inability to perform a class or range of jobs.  Rather, the evidence, along with Plaintiff's own testimony, reflects Plaintiff desired a transfer to another supervisor.  As discussed by the court in Prichard v. Dominguez, 2006 WL 1836017, * 9 (N.D.Fla. June 29, 2006), "[n]umerous cases . . . have . . . held that depression and anxiety caused by working with a particular supervisor or co-employee will not constitute a substantial impairment in the major life activity of working."

During her deposition, Plaintiff was asked about the basis of the charge she filed against Jordan. Plaintiff claimed the basis of the charge was "hostile work environment" and

that Jordan was hostile because (i) Jordan did not like her, and (ii) Jordan was upset because Plaintiff told Brown she was not comfortable reporting to Jordan and did not like her management style.  (Plaintiff Dep. at 35).  Later in her deposition, Plaintiff claimed that she filed the complaint about Jordan with Gregory because Jordan's allegedly hostile conduct heightened her disability.  (Plaintiff Dep. at 62).  She did not claim that Jordan discriminated against and harassed her because of her disability.  Id.

Dr. Lupo's comments regarding Plaintiff's condition, Plaintiff's request for a transfer to a similar job under a different supervisor, the lack of sufficient medical evidence that Plaintiff was unable to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person, and the Plaintiff's ability to perform without difficulty during the audit from July 24, 2006, to approximately August 7, 2006, demonstrate that Plaintiff was not substantially limited in the major life activity of working.  Similarly, Plaintiff has failed to provide any evidence from which a reasonable jury could find that she was limited in the major life activities of sleeping or concentrating.  Accordingly, she did not have  physical or mental impairment that substantially limited one or more major life activities.

Plaintiff has further failed to establish that she either had a record of being disabled or was regarded as such.  An individual has a record of impairment if the individual "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities."  29 C.F.R. § 1630.2(k).  The 2008 ADA Act provides that "an individual meets the requirement of 'being regarded as having

such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under the Act because of an actual or perceived physical or mental impairment whether or not the impairment is perceived to limit a major life activity." 42 U.S.C. § 12102(a)(3)(A).  However, transitory impairments, which have a duration of six months or less, are specifically excluded from the definition of disability under the 2008 ADA Act. 42 U.S.C. § 12102(a)(3)(B).  The current regulation, which applies here, provides an individual is regarded as impaired if such individual:

> (1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;
>
> (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
>
> (3) Has none of the impairments defined in paragraph (h) (1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(l).

Under either standard, Plaintiff has failed to establish she has a substantially limiting impairment that was permanent or long-term rather than transitory in nature.  Jordan claims that she was never informed, by Plaintiff or otherwise, that Plaintiff had a permanent or long-term impairment (or an impairment that substantially limited a major life activity).  Jordan claims to know only that Plaintiff's short term disability benefits had ceased and that she had been instructed to return to work.  While Dr. Lupo had been treating Plaintiff for an extended period of time, there is no evidence that Jordan or other employees of Defendant were aware

of any condition prior to the time she went out on short term disability.  Moreover, Plaintiff has failed to produce evidence that either Jordan or another employee of Defendant regarded or perceived her as having an actual or physical mental impairment that was not transitory in nature (or an impairment that substantially limited a major life activity).  Accordingly, Plaintiff has failed to establish that she was disabled under the ADA.  As she has failed to establish an essential element of her prima facie case, Defendant is entitled to summary judgment as to Count I of Plaintiff's Complaint.

Even if Plaintiff could establish a prima facie case, Defendant has articulated legitimate, nondiscriminatory reasons for the alleged adverse employment actions.  Plaintiff's employment was terminated for telling Jordan she was checking into the hospital when in fact she did not.  Plaintiff neither reported to nor called into work for the next two days, despite the fact that she never checked into the hospital.  She did not obtain an excuse from Dr. Lupo until the day after she was terminated.  To the extent the cancellation of Plaintiff's cell phone and company credit card can be construed as an adverse action, Defendant has provided evidence it took such action as a result of Plaintiff's misuse.  Furthermore, to the extent Jordan's supervisory duties were temporarily limited or suspended upon return from short term disability, Jordan provided a legitimate basis for this decision due to Plaintiff's prolonged absence and complaints from subordinates regarding her performance.

No reasonable jury could conclude that these were not legitimate and nondiscriminatory reasons.  Plaintiff has failed to present evidence any evidence to create an issue of fact that this decision was pretextual.  As stated by the court in <u>Prichard</u>, "employees

may not use the [ADA] . . . as the means to obtain a transfer from an undesirable boss."
Prichard, 2006 WL 1836017 at *13.   Accordingly, Defendant is entitled to summary
judgment as to Count I of Plaintiff's Complaint.[9]

In Count II of her Complaint, Plaintiff alleges she was retaliated against in violation
of the ADA for requesting a reasonable accommodation.   In order to establish a prima facie
case of ADA retaliation, a plaintiff must show: "(1) that [s]he engaged in statutorily protected
activity; (2) that [s]he suffered an adverse employment action; and (3) a causal link between
the protected activity and the adverse action."   Satchel v. School Board of Hillsborough
County, 251 Fed. Appx. 626, 629 (11th Cir. 2007).   Once a prima facie case has been
established, the employer has the opportunity to articulate a legitimate, non-retaliatory reason
for the adverse action.   Id.   If the employer satisfies this requirement, the burden shifts back
to the plaintiff to prove the reason provided is pretextual.   Id.

Plaintiff claims her requests for a transfer were requests for reasonable
accommodations under the ADA.   As already discussed, Plaintiff has failed to establish that
she was disabled as defined under the ADA.   Furthermore, her request was for a transfer to
another supervisor, not for a different type of job.   Plaintiff has failed to establish that her
subjective belief that she was entitled to a transfer because of her condition was objectively
reasonable.   Thus, it is not a statutorily protected activity.   See Satchel, 251 Fed. Appx. at 2.

_____

[9]Defendant has also argued that Plaintiff's recovery would be limited by the after-acquired evidence
doctrine.   This argument is based on Defendant's discovery on July 14, 2008, that Plaintiff had falsified her
employment records by misrepresenting the fact that she had graduated from high school.   Falsification of
records also violates Defendant's Standards of Integrity and would have provided an independent basis for
termination.   A motion to compel and re-open discovery for the purpose of deposing Plaintiff about the issue
is currently pending.   Because the Court has concluded Defendant is otherwise entitled to summary judgment,
the matter is moot and need not be addressed further.

Even if it were reasonable, it was initially made in February of 2006. Plaintiff was not terminated at that time. Rather, she was allowed to stay out on short term disability until July 10, 2006, and was not terminated until August 23, 2006. Thus, she has failed to demonstrate a causal connection between the two events. See id. at 3.

Moreover, as already discussed, Plaintiff has failed to provide evidence that Defendant's non-retaliatory reasons for terminating her employment were a pretext for discrimination. Accordingly, Defendant is entitled to summary judgment as to Count II. As the FCRA is modeled after the ADA, and as courts construe it in conformity with the ADA, Plaintiff is also entitled to summary judgment as to Counts III and IV. See Smith v. Avatar Properties, Inc., 714 So. 2d 1103, 1106-07 (Fla. 5th DCA 1998).

It is therefore ORDERED AND ADJUDGED that:

1.    Defendant's Motion for Summary Judgment (Dkt. 19) is **GRANTED**.

2.    Summary Judgment is **GRANTED** in favor of Defendant as to all of Plaintiff's claims.

3.    All pending motions are denied as moot. The Clerk is directed to close this file.

**DONE** and **ORDERED** in Tampa, Florida on October 10, 2008.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Even\2007\07-cv-1736.msj.frm